# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.                                              **CRIMINAL COMPLAINT**

JEFFREY GALASKA,
JOSEPH HERNKE,
JENNIFER CARLSON,                     CASE NO. *06 -81 m (AEG)*
SUSAN CHRISTIE, &
NICOLE RUHRER.

I, Mark Banks, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**Count one:** Beginning by 2001, and continuing through August 11, 2006, in the State and Eastern District of Wisconsin, and elsewhere, **JEFFREY GALASKA, JOSEPH HERNKE, & JENNIFER CARLSON,** the defendants herein, knowingly intentionally conspired with each other, and with others known and unknown, to distribute five kilograms or more of cocaine, a Schedule II controlled substance; all in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A).

**Count two:** Beginning at least by 2002, and continuing through August 11, 2006, in the State and Eastern District of Wisconsin, **JEFFREY GALASKA, SUSAN CHRISTIE & NICOLE RUHRER,** the defendants herein, knowingly and intentionally conspired with each other and with others known and unknown, to commit money laundering. The defendants conducted financial transactions, including the purchases of real property and vehicles, using Galaska's drug proceeds, which were done to conceal Galaska's ownership and interest in assets purchased with drug proceeds. All in violation of Title 18, United States Code, Section 1956(h).

I further state that I am a federally deputized Task Force Agent with the Drug Enforcement Administration, and that this complaint is based on the following facts:

Please see the attached affidavit.

Continued on the attached sheet and made a part hereof:     _X_ Yes ___ No

_Mark Banks_
Mark Banks
Task Force Agent, Drug Enforcement Administration
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 14, 2006
Date

The Honorable Aaron E. Goodstein
United States Magistrate Judge
**Name & Title of Judicial Officer**

at Milwaukee, Wisconsin
City and State

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT & SEARCH WARRANTS

I, Mark Banks, do hereby depose and state as follows:

1.     I am a Special Agent of the Wisconsin Department of Justice – Division of Criminal Investigations. I have been so employed for over 15 years. I also am a federally deputized Task Force Officer with the Drug Enforcement Administration in Milwaukee, Wisconsin. As part of my duties, I investigate violations of state and federal controlled substances laws, including violations of 21 U.S.C. §§ 841 & 846.

2.     Although I am not personally familiar with the specifics of the Galaska investigation, I have regularly discussed the matter with Special Agent Jay Novak, who I believe to be truthful and reliable. Based on those discussions, I hereby adopt and incorporate by reference Special Agent Novak's August 14, 2006, affidavit, attached hereto as Exhibit 1.

I, JAY NOVAK, declare as follows:

## A.    **PURPOSE AND BACKGROUND**

1.    I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI") and have been so employed since 1992, assigned to the Milwaukee Office. In the course of my work, I investigate violations of state and federal narcotics laws, and related violations. As part of my employment, I have received specialized training in investigating narcotics violations, including, but not limited to, training in drug identification, use of informants, undercover operations, money laundering, conspiracy and gang investigations, search warrant procedures and investigative techniques used in the investigation of individuals and organizations involved in the illegal manufacture and sale of controlled substances.

2.    During the course of my employment with DCI, I have participated in at least five hundred investigations involving violations of state and federal narcotics laws. I have personally applied for and obtained at least thirty federal search warrants and at least forty state search warrants for narcotics and firearms-related offenses and participated or assisted in numerous other federal and state search warrants for firearms and narcotics-related offenses obtained by other agents/officers. These warrants involved the search of locations ranging from residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, computer and electronic data storage devices, and telephonic paging devices. Evidence searched for, and recovered, in these locations have included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments and various assets that were purchased with the proceeds of drug trafficking. I have had numerous discussions with other, experienced law enforcement officers, and have conducted and been present at numerous interviews of self-admitted narcotics traffickers and cooperating defendants concerning the manner in which drug traffickers and money launderers operate. In the course of my employment and experience, I have also become aware of techniques and practices used by narcotics traffickers to avoid detection by law enforcement. Among these techniques are the use of multiple locations at which to conduct narcotics related activities, and keep records and narcotics, hidden compartments in vehicles used to hide narcotics and currency, the use of pagers, voice mail, cellular telephones, pay phones, and the use of numerous associates and "workers" to further their criminal enterprise. I have also become aware of the various techniques individuals use to conceal the source or nature of drug proceeds. Among the techniques utilized are the purchase of assets and financial instruments in nominee names using cash, and breaking down or "structuring" transactions so as to avoid certain reporting requirements of financial institutions.

3.    Based on my training and experience, it is my opinion that people involved in large scale narcotics trafficking and/or money laundering almost always keep records of their transactions. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Narcotics traffickers and money launderers typically keep documents demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through their illegal activities, as well as

1

the methods used to launder the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike the controlled substances, are often maintained for long periods of time, even several years. Such records are often maintained under the dominion and control of the narcotics traffickers and money launderers, and as such, are often kept in their residences.

4.    It is further my opinion that based on my experience from participating in searches and on conversations with other experienced law enforcement officers who have participated in narcotics and money laundering related searches, drug traffickers who amass the proceeds of their enterprise, and those who handle the money for the enterprise, quite often secure their money within a secure location within their dominion and control, often in their residences.

5.    It is also my opinion, based on my training, experience, and observation, that large-scale drug trafficking and money laundering requires the cooperation, association and communication between and among a number of people within the organization. As a result, people who traffic in narcotics or launder money for such organizations will possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates.

6.    Based upon my training, experience, and participation in controlled substance investigations and associated financial investigations, and based upon conversations with other experienced narcotics agents, I know:

(a)    that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the transportation, ordering, possession, sale, and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers and other documents are usually maintained at the suspect's home residence.

(b)    that drug traffickers commonly "front" (provide on consignment) cocaine and/or other controlled substances to their customers and associates, and that they maintain the aforementioned books, records, ledgers, and notes of these transactions, most frequently in their residences.

(c)    that it is common for drug traffickers to secret contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences for ready access and to conceal them from law enforcement authorities.

(d)    that drug traffickers commonly maintain addresses and telephone numbers in books or on papers which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization.

(e)    that drug traffickers attempt to legitimize their profits from the sales of drugs. To accomplish these goals, drug traffickers often utilize domestic banks and their attendant services, cashiers

2

checks, money orders, money drafts, money wire transfers, and documentation of businesses, real and fictitious.

(f)     that persons involved in drug trafficking often conceal in their residences large amounts of currency, financial instruments, precious metals, jewelry, and other items of value which are the proceeds of drug transactions and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking.

(g)     that drug traffickers often place assets in names other than their own in order to avoid detection by law enforcement or the Internal Revenue Service.

(h)     drug traffickers frequently used pagers or "beepers" and cellular telephones to facilitate communications and in attempts to avoid law enforcement detection, and sometimes use police scanners and walkie talkies to notify other coconspirators of the presence of law enforcement or rival drug traffickers.

(i)     drug traffickers often keep firearms, ammunition, and other security devices such as cameras and booby-traps, in their residences for the protection of their enterprise and assets.

(j)     that drug traffickers usually keep paraphernalia for the packaging, cutting, cooking, weighing and distribution of controlled substances in their residences and in "stash house" locations, specifically locations used by the conspiracy to conduct these activities.

(k)     drug traffickers who conduct interstate transportation and distribution of controlled substances must therefore transport the controlled substances themselves or have couriers transport the drugs for them. Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, and taxi cab receipts.

(l)     drug traffickers often have constructed in their residences hidden compartments or areas wherein they can secrete controlled substances and other contraband.

## B.    **PURPOSE OF AFFIDAVIT**

7.     I make this affidavit in support of a criminal complaint and five arrest warrants, and in support of an application for search warrants for five premises. Descriptions and criminal histories of the proposed defendants, and property descriptions, follow:

### Properties

**3769 South 22nd Street, Milwaukee, WI,** more particularly described as 1½ story single family residence, consisting of brown brick, dark brown trim and a brown shingled roof with the numbers 3769 in black numerals on a white background appearing to the right of the east facing front

3

door, which has a black metal storm door.. The rear portion of the residence is 1 story consisting of tan stone and brown shingled roof. The residence also has a detached garage located to the west of the residence at the end of the driveway which runs along the south side of the residence. The garage consists of tan siding, dark brown trim brown shingled roof with an overhead east facing door.

**3727 West Birchwood, Milwaukee, WI,** more particularly described as a single family single story residence consisting of tan siding with the front, west facing portion having dark brown siding on the upper half, and a brown shingled roof. The numbers 3727 appear to the right/south of the front door. The residence also has a detached garage consisting of tan siding, a brown shingled roof and a west facing overhead door.

**1675 North 116 Street, Wauwatosa, WI,** more particularly described as the upper unit of a two unit (upper/lower) two story building consisting of reddish brown brick, white siding on the upper half of the front face. The numbers 1675 appear to the right / north of the front door and the numbers 1673 to the left /south of the front door. The residence also has a detached garage located to the northwest of the residence with the driveway off W. Walnut St. The garage consists of white siding, gray roof and has two overhead doors which face north.

**1334 Marquette Avenue, South Milwaukee, WI,** the lower unit, of a multi-family 2 ½ story dwelling consisting of tan siding, white trim, green siding on the front/south facing lower half, and a green roof. The numbers 1334 appear on the lower half of the white/front south facing door.

**11133 Ohio Street, Milwaukee, WI**, the eastern-most unit in a two-unit two story building consisting of cream siding, gray roof and two north facing front doors with the numbers 11133 in black numerals on a white background appearing next to the easternmost front door. A detached garage for the residence is located to the south of the residence off the alley. The garage consists of cream siding, gray roof and has two overhead doors which face south.

Defendants

**Jeffrey J. Galaska:** w/m, DOB: 06/10/1969. Galaska has one prior felony drug conviction, a 1991 possession with intent to deliver, Milwaukee County, for which he was sentenced to 3 years prison stayed, 1 year jail.

**Joseph E. Hernke:** w/m, DOB: 03/17/1969. Joseph Hernke is a drug trafficking associate of Galaska. He is currently on state supervision for failure to support a child. He has a felony conviction for Failure to support Child; and a 2003 battery misdemeanor.

**Nicole C. Ruhrer**: w/f, DOB: 05/10/1973. Ruhrer is the sister of Galaska. She has no known criminal history.

**Susan F. Christie:** w/f, DOB: 09/01/1950. Christie is Galaska's mother. She has no known criminal history.

4

**Jennifer J. Carlson:** w/f, DOB: 08/18/1983. Carlson is Galaska's girlfriend. She has no known criminal history.

## C.    BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

8.    All of the information contained in this affidavit is based upon my personal knowledge and investigation, law enforcement, telephone and business records, and on information from citizen witnesses whom I believe to be truthful and reliable. It is also based upon information gained from interviews with cooperating defendants and informants, whose reliability is established separately herein.

## D.    PROBABLE CAUSE - DRUG TRAFFICKING INFORMATION

### i.    Informant reliability

9.    In this affidavit, I will refer to these informants as CI-1, CI-2, CI-3 and CI-4. I believe these informants to be truthful and reliable because I have been able to confirm much of each informant's information through information obtained from other witnesses, subpoenaed telephone records, subpoenaed bank records, and police department contacts Additionally, I believe the information obtained from these informants is reliable because substantial portions of the information could only have been known by coconspirators of the drug organization, such as methods of operation, customers of the conspiracy, residences and other locations associated with the coconspirators and location of assets. I also believe all of these informants are reliable because I interviewed each informant separately, and their information was largely consistent with each other. All four informants also provided all of the information against their penal interest. I also believe that CI-4 is reliable because CI-4 has made recorded telephone contacts and personal contacts with targets of this investigation, and those recordings have corroborated the information CI-4 has provided.

### ii.    Background Summary

10.    During this investigation, I have interviewed many individuals who have provided information to me about the drug trafficking activities of Jeffrey J. Galaska, a/k/a Baldy, and Joseph E. Hernke. These informants have indicated, and the investigation has otherwise established, that Galaska is a large-scale cocaine dealer in southeastern Wisconsin, and is assisted by Hernke and others. Informants have also identified several relatives and close associates of Galaska who assist him in his cocaine trafficking and in laundering the proceeds of the drug trafficking, including by acting as nominees for asset purchases. They include: Susan F. Christie, the mother of Jeffrey Galaska; Nicole C. Ruhrer, a sister of Jeffrey Galaska; Jennifer J. Ruhrer, a sister of Jeffrey Galaska; Angela L. Stein, a former girlfriend of Galaska; and Galaska's current girlfriend, Jennifer J. Carlson.

5

### iii. **Information from CI-1**

11.    Between April 2005 and August 2006, I interviewed CI-1 who stated that in approximately 2003 to 2004, Galaska was supplying cocaine to an associate of CI-1. CI-1 observed Galaska deliver distribution-quantities of cocaine to the associate's residence approximately 2-3 times per week. CI-1 had also been to Galaska's residence, which CI-1 identified as 3769 S. 22nd Street, Milwaukee, where Galaska stored cocaine and conducted cocaine transactions. CI-1 had also been to Galaska's trailer home in a campground located in Jefferson County, Wisconsin, where Galaska would make cocaine deliveries to customers. CI-1 subsequently identified the trailer home on lot # 117 located in the Bark River Campground, W2340 Hanson Rd., Jefferson, Wisconsin.[1]

12.    CI-1 identified Joseph Hernke as a cocaine trafficking associate/customer of Galaska and stated that Hernke also had a trailer home next to Galaska's which the CI identified as the trailer home on lot 116 in the Bark River Campground. CI-1 further stated that Hernke's girlfriend/wife (Tammy Carlson) is the sister of Galaska's girlfriend (Jennifer Carlson).

13.    CI-1 also identified vehicles used by Galaska when making cocaine deliveries, including a white GMC Yukon Denali and a silver Jeep. CI-1 said Galaska also owns a Harley Davidson motorcycle and an Argo recreational trailer, which he kept at the Jefferson County location.

14.    CI-1 also identified various other individuals associated with Galaska's drug trafficking: (a) Jeffrey Benkowski, an associate of Galaska who sold cocaine for Galaska during that time; (b) Jennifer Carlson, who is Galaska's girlfriend. CI-1 stated that Carlson had accompanied Galaska to the residence of CI-1's associate on three or four occasions that CI-1 could recall (during 2003-2004) when Galaska delivered cocaine to CI-1's associate; (c) Nicole Ruhrer is Galaska's sister. CI-1 stated that Nicole lived with Galaska in a residence in the area of S. 20th St. and W. Morgan Ave., later identified as 3769 S. 22nd Street, Milwaukee. CI-1 stated that Galaska had told CI-1 that Nicole lived with him to help to conceal Galaska's ownership of the residence as Nicole has legitimate income and he titled his assets, including the home, in her name.

### iv. **Information from CI-2**

14.    Between June 2005 and July 2006, I interviewed CI-2 who stated that he/she was aware that Galaska has been selling cocaine for the last five years. CI-2 had accompanied Galaska on a weekly basis throughout the summer of 2004 when Galaska delivered cocaine to an individual named Thomas Hernke, the father of Joseph Hernke. CI-2 observed Galaska deliver 6-9 ounce

---

[1]WE Energies lists the subscriber of service at W2340 Hanson Rd. Lot 117, Jefferson as Jeffrey Galaska since May 2004. During the week of July 31, 2006, I went to the Bark River Campground, 2340 Hanson Rd., Jefferson, and observed a crème colored Layton by Skyline travel trailer on the lot. I also observed an eight wheeled Argo recreational vehicle parked next to the travel trailer.

quantities of cocaine to Thomas Hernke approximately 30-40 times, with the last occasion during the summer of 2004. CI-2 and Galaska stopped associating with each other at that time. CI-2 stated that Jennifer Carlson, Galaska's longtime girlfriend, and CI-3, had also accompanied CI-2 and Galaska when Galaska made deliveries to Thomas Hernke.

15.     CI-2 identified the residence of Jennifer Carlson as 1334 Marquette Avenue, South Milwaukee where she resides with her parents, and stated that Carlson continues to live there presently. CI-2 stated that Jennifer Carlson also stored cocaine at the Marquette Avenue residence for Galaska during 2004. WE Energies lists the current subscriber of service at 1334 Marquette Ave., lower unit as Gary Carlson since August 2001. Tammy Carlson was also listed on the account and was listed as the daughter of Gary Carlson.

16.     CI-2 stated that Jennifer Carlson frequently accompanied Galaska in 2004 to taverns in the Milwaukee area where Galaska regularly distributes cocaine. Carlson would sometimes keep cocaine in her purse or on her person and Galaska will direct customers to her for purchases. CI-2 stated that CI-2 had purchased small quantities of cocaine from Carlson on approximately 6 occasions, meeting Carlson at her residence on Marquette Avenue in 2004. CI-2 stated that CI-2 continues to see Carlson and Galaska at these taverns, but because CI-2 is no longer actively involved with Galaska, CI-2 has not attempted to purchase cocaine from either of them.

17.     CI-2 identified Joseph Hernke, the son of Thomas Hernke, as another cocaine customer of Galaska. CI-2 identified Joseph Hernke's residence in 2004 as the upper unit at 1408 Missouri Avenue, South Milwaukee, where he lived with his girlfriend, Tammy Carlson. CI-2 stated that he/she had observed Galaska delivering ½ ounce quantities of cocaine to Joseph Hernke on numerous occasions between approximately 2003-2004 and had heard through other drug associates that Hernke was purchasing larger amounts in 2005.

18.     CI-2 also stated that Galaska owned a trailer in a campground in Jefferson County, Wisconsin, and would make deliveries of cocaine to customers at the trailer home. In early 2005, Galaska told CI-2 that he had to remove the addition or remove the trailer from the lot as it violated a campground or county code (it was a "fixed" or permanent structure, which was prohibited). I know, based upon surveillance in the past several months, and from other informant information, that Galaska has since put a new trailer on the lot that is not a permanent structure.

19.     CI-2 identified Galaska's vehicles, used during drug trafficking, as a white GMC Yukon Denali, a silver Jeep, a white Nissan Frontier pickup and a blue/black Dodge Magnum. CI-2 stated Galaska had traded in the white Denali for the Dodge Magnum. CI-2 stated Galaska also owns a custom Harley Davidson motorcycle, a Triton boat, an Argo all terrain recreational vehicle and a snowmobile.

20.     CI-2 stated that Galaska is unemployed and Galaska titles his vehicles and other assets in nominee names, specifically in the name of his sister, Nicole Ruhrer; his mother, Susan Christie; drug associate Jeffrey Benkowski; and Randy Stein, the brother of Galaska's ex-girlfriend

7

Angela Stein. CI-2 further stated that Nicole Ruhrer lives with Galaska at Galaska's residence at 3769 S. 22nd St., Milwaukee. Galaska purchased the residence in approximately 2000-2001 and initially titled it in the name of his girlfriend, Angela Stein. During approximately the summer of 2004, Galaska and Stein broke up, at which time Galaska titled the residence in the name of Nicole Ruhrer.

21.     CI-2 stated Galaska had the motorcycle registered in the name of Jeffrey Benkowski. CI-2 stated that Benkowski was a cocaine customer of Galaska who had stored cocaine for Galaska at Benkowski's residence. CI-2 stated Galaska normally stored the motorcycle in the garage at his grandmother's residence, 3728 S. 15th Pl, Milwaukee, or in the garage at Joseph Hernke's residence. CI-2 stated that Galaska's white GMC Yukon had been registered in Susan Christie's name and his silver Jeep in the name of Nicole Ruhrer. According to CI-2, Galaska purchased the Triton boat at the Milwaukee boat show in 2004. CI-2 and Randy Stein were both present, and Galaska titled the boat in Randy Stein's name. CI-2 indicated that between 2002 and 2004, Randy Stein regularly sold cocaine for Galaska and on one occasion, CI-2 obtained ¼ ounce of cocaine from Randy Stein at Stein's residence when Galaska sent CI-2 there to obtain it. CI-2 did not know the address of Stein's residence, but described the general location and physical layout of the residence which matches his known residence, 11133 Ohio Street, Milwaukee.[2]

22.     In approximately 2001 to 2004, CI-2 also observed Galaska's mother, Susan Christie, come to Galaska's residence and pick up currency from Galaska which was proceeds from his drug trafficking. On one occasion during that time period, CI-2 observed Galaska give Christie a paper bag containing approximately $10,000. CI-2 also had accompanied Galaska on at least several occasions when he went to Christie's workplace, a Boston Market restaurant, and put money in the trunk of her vehicle, a black Buick Riviera which I have determined through DOT records and surveillance to now be owned by Joseph Hernke. CI-2 also observed Galaska take money to Christie's residence occasionally.

23.     Up and through the summer of 2004, CI-2 observed Galaska storing cocaine in the basement of 3769 S. 22nd St. Galaska also kept a scale in the basement's suspended ceiling and had a safe in his upstairs bedroom. CI-2 stated that Galaska had large amounts of custom made expensive jewelry including a Rolex watch and a diamond necklace with a pendant. Within the past few years, Galaska also purchased a diamond ring for Jennifer Carlson.

24.     CI-2 has observed Galaska with an AR-15 type assault rifle and a .40 caliber pistol at his trailer in Jefferson County as recently as 2004. The CI further stated that Galaska would also commonly meet customers at the trailer who resided outside the Milwaukee area.

---

[2]I have also conducted surveillance at 11133 Ohio Street, and have regularly observed Tina Stein, Randy Stein's wife, at the location.

8

### v.    Information from CI-3

25.    In February 2006, I interviewed CI-3 who stated that between approximately 2001 and 2002, CI-3 became aware that Galaska was involved in cocaine trafficking. CI-3 stated that Joseph Hernke had been storing controlled substances for Galaska and Galaska subsequently asked if CI-3 would store them for Galaska. In 2001, CI-3 began storing cocaine for Galaska at the CI's residence. CI-3 stated that Galaska would also use the CI's residence to weigh and package the cocaine and would give the CI small amounts of cocaine as payment for the utilization of the CI's residence. CI-3 stated that Galaska sold cocaine weekly at various taverns in the South Milwaukee area.

26.    CI-3 identified Jennifer Carlson as the then-current girlfriend of Galaska and stated she would store cocaine for Galaska and would also on occasion deliver the quantities to CI-3 that CI-3 would store for Galaska. CI-3 described a residence where Carlson resided at the time, which matches the description of 1334 Marquette Avenue, known to be her current residence.

27.    CI-3 identified various drug associates/customers of Galaska including Joseph Hernke and Hernke's father, Thomas Hernke. CI-3 had accompanied Galaska when Galaska delivered cocaine or picked up money from Thomas Hernke on approximately 20-30 occasions. CI-3 stated that Galaska drove a Jeep vehicle when Galaska made deliveries to Thomas Hernke. CI-3 stated that Galaska would normally deliver between 2 and 6 ounces of cocaine each time. CI-3 stated that Jennifer Carlson and CI-2 also accompanied Galaska when he made deliveries to Thomas Hernke.

28.    CI-3 identified Galaska's other vehicles as a white GMC Denali and a 1998 Jeep. CI-3 stated that Galaska also had a black Harley Davidson motorcycle and Galaska told CI-3 that Galaska had paid $20,000 for it. CI-3 stated that CI-3 had not known Galaska to have ever been employed and that Galaska made money strictly by drug trafficking.

29.    CI-3 also stated that to conceal assets purchased using drug proceeds, Galaska would utilize nominee names when titling his vehicles and other assets, specifically his sister, Nicole Ruhrer and his mother (Susan Christie). CI-3 stated that in 2001-2002, Galaska resided on South 22nd Street in Milwaukee with his now-former girlfriend, Angela Stein. CI-3 stated that Galaska told the CI that Galaska had purchased the residence and had titled the residence in Stein's name. CI-3 stated that Galaska told the CI that Galaska had put down $24,000 to $25,000 for the purchase. CI-3 stated that CI-3 had observed Galaska store cocaine in the basement of his residence

30.    CI-3 further stated that Galaska owned a trailer home in Jefferson County and Galaska would deliver cocaine to customers at that location during 2001-2002.

### vi.    Corroboration for historical informant information regarding assets

31.    I have been able to corroborate substantial portions of the asset information provided by the three informants described above. In the financial information sections below, I have detailed

9

substantial amounts of financial information I have analyzed regarding these assets. However, I have also corroborated this information through surveillance and records checks with public and private databases. For example, while on surveillance during 2006 and up to the present, I and other agents have identified Galaska driving a blue/black 2005 Dodge Magnum, Wisconsin license 290JHY, a white 2002 Nissan Frontier pickup, Wisconsin license 570410, and a Harley motorcycle, Wisconsin license GD862. Records checks through the Wisconsin Department of Transportation files identified the registered owner of the Dodge Magnum and the Nissan Frontier as Susan F. Christie, Galaska's mother. DOT records also reflect that the Harley motorcycle is titled in the name of Jeffrey Bentkowski. I have also observed Galaska on many occasions during 2006 at his residence, 3769 South 22nd Street, Milwaukee. That home is titled in the name of Nicole Ruhrer since 2004, and was formerly titled in the name of Angela Stein. I have also identified the Triton boat (described more fully below) referred to by CI-2. State DNR records reflect that the Triton boat is currently registered in the name of Randy Stein.

### vi.    CI-4's arrest and information

32.    In March 2006, CI-4 was arrested by special agents during the execution of a federal search warrant. CI-4 was an individual who had been identified by CI-2 and CI-3 as one of Galaska's large scale cocaine customers. On the day of the execution of the search warrant, agents observed Galaska arrive at CI-4's residence in the black Dodge Magnum. Two other white male individuals and a white female individual were with Galaska. Galaska approached the CI's residence, later returned to the Magnum and subsequently drove from the area.

33.    Special agents seized approximately 80 grams of cocaine from CI-4's residence during the search warrant. CI-4 agreed to cooperate, and in subsequent interviews, CI-4 identified his source of cocaine as Galaska. CI-4 stated that Galaska had been supplying CI-4 with cocaine for approximately the last 8 years. CI-4 initially purchased up to an ounce of cocaine from Galaska every two weeks and then began buying one ounce quantities every two weeks. CI-4 stated that in the last three years, CI-4 purchased two to three ounces of cocaine every three weeks with the largest quantities being four to four and one half ounces.

34.    CI-4 stated that the cocaine which was seized from the CI's residence was what remained of four ounces which Galaska had delivered to CI-4 on what CI-4 believed was March 9, 2006. CI-4 stated that Galaska would come to the CI's residence every Friday in the early afternoon hours to pick up money CI-4 owed for past cocaine deliveries. If CI-4 wanted to obtain an additional quantity of cocaine, CI-4 would contact Galaska prior to Friday and Galaska would then deliver the cocaine to CI-4 when Galaska picked up the money. On the last delivery of the four ounces to CI-4 on March 9, Galaska called CI-4 and told CI-4 that Galaska would be delivering it as Galaska was going to northern Wisconsin. CI-4 stated that Galaska had come to the residence of CI-4 on the date of the arrest of CI-4 to pickup money from CI-4. CI-4 paid Galaska $3,200 toward the ongoing drug debt and CI-4 owed Galaska a balance of $3,700.

10

35.     CI-4 stated that Galaska would normally come to CI-4's residence driving a white SUV vehicle and that he would also sometimes be accompanied by other male individuals. CI-4 believed Galaska had these individuals along with him as "bodyguards" or counter-surveillance.

36.     CI-4 stated that Galaska had purchased a Triton boat and Galaska had kept the boat trailer at the residence of CI-4 during the summer of 2005. CI-4 subsequently identified the boat to S/A Novak, a red and black Triton, WI registration WS8131GR, which was docked on Okauchee Lake. As indicated above, I conducted a check through the Wisconsin Department of Natural Resources on boat registration WS8131GR and the registered owner was identified as Randy P. Stein, 3935 W. Greenfield Ave., Greenfield, WI. Randy Stein is the brother of Galaska's ex-girlfriend, Angela Stein.

37.     CI-4 identified Angela Stein as Galaska's ex-girlfriend; Jennifer Carlson as Galaska's girlfriend and the sister of Tammy Carlson, the girlfriend of Joseph Hernke; and Jeffrey Benkowski as a friend of Galaska who the had come to the residence of CI-4 with Galaska approximately a year prior to that date when Galaska was picking up drug money.

### vii.     CI-4's active cooperation

38.     On March 30 and 31, 2006, CI-4 placed monitored and recorded telephone calls to Galaska in attempts to set up a controlled payment of money and potential purchase of four ounces of cocaine from Galaska. On March 31st, agents conducting surveillance at Galaska's residence at 3769 S. 22nd St., Milwaukee, observed Galaska exit the residence and drive from the area in the Dodge Magnum. Galaska first went to the 1200 block of Madison Street in South Milwaukee where Galaska parked. Shortly thereafter, the vehicle was observed unoccupied. Shortly thereafter, Galaska was observed re-entering the vehicle with another white male believed to be Todd Blavat, an individual who informants have identified as a drug associate of Galaska's. Galaska then drove to the residence of CI-4.

39.     I supplied CI-4 with $2,500 in prerecorded currency to utilize as payment to Galaska for CI-4's drug debt, and fitted CI-4 with recording equipment. I observed Galaska arrive at CI-4's residence, where CI-4 allowed him in. (The individual believed to be Blavat did not go in, but instead went to a nearby tavern.) A short time later, I observed Galaska appear from the area of CI-4's residence, walk to and enter the same tavern. I met with CI-4 and reviewed the recording, from which I learned that upon Galaska entering the residence, CI-4 gave Galaska the $2500 in prerecorded currency and told Galaska that it was $2500. Galaska told CI-4 "alright, cool, I gotta get some, I'm just waiting for fucking Billy man" and "probably by, fucking middle of ah, probably beginning of next week".(referring to when Galaska would be obtaining additional cocaine). CI-4 told Galaska "the sooner the better" and Galaska then stated that Galaska would call CI-4 before Galaska came to the CI's residence. Agents conducted surveillance of Galaska after he left the area. Galaska drove directly back to his residence at 3769 S. 22nd St. Galaska and the white male (Blavat) then entered the residence.

11

40.	On April 14, 2006, CI-4 told me that Galaska had left a voicemail message for CI-4 and had also come to CI-4's residence with Joseph Hernke, but CI-4 did not speak to them. CI-4 stated that CI-4 subsequently had telephonic contact with Joseph Hernke who stated that he had accompanied Galaska to the residence of CI-4 and that Galaska had wanted to pick up drug money from CI-4 and also had a quantity of cocaine to deliver to CI-4. On April 16, 2006, CI-4 stated that Galaska left messages for CI-4 regarding their drug business which I recorded. In one message, Galaska stated that Galaska was coming to the CI's residence in approximately an hour. In another, Galaska identified himself as "Jeff" and stated, "give us a call back man, I wanted to, I came out there the other day to drop off your tip-ups and I wanted to pick up a couple rods tomorrow for the um, for the summer, ah give me a call as soon as you can, fly out there or something." CI-4 stated that the message was coded by Galaska and that tip-ups meant cocaine and rods meant money.

41.	On April 18, 2006, I again met with CI-4 and CI-4 placed a recorded telephone call to Galaska, at telephone number 414-736-3534, which was a new cellular telephone number for Galaska which was provided to CI-4 by Joseph Hernke. CI-4 told Galaska that CI-4 had health problems and CI-4 would call Galaska in the future as the CI did not have any money at that time. Galaska told CI-4 to "take your time" and to call Galaska "when you're ready."

42.	Between May 2 and July 20, 2006, I recorded numerous telephone calls and messages between CI-4, Jeffrey Galaska and Joseph Hernke, during which Galaska sometimes told CI-4 to call Hernke's telephone when CI-4 needed to reach Galaska. In a May 3, 2006 call, Galaska told CI-4 that CI-4 could call him when CI-4 was ready to obtain more cocaine. Later that day, CI-4 received a call from Hernke. When the two spoke, Hernke said that Galaska had told him to call CI-4 to see if everything was alright with CI-4, as if to check on whether CI-4 had been arrested or was cooperating with the police. The CI stated that the CI was unable to conduct transactions due to the CI's health problems and that CI-4 had told Galaska that CI-4 would call Galaska. Hernke stated "that's his fucking ah, his worries or whatever he just wanted me to make sure confirming with you that everything is all right, that's it" and "if there was something corny going on I was, I would expect something out of you, you know?". CI-4 stated that everything was fine and Henrke subsequently stated "all right well, call me and we'll come out and see."

43.	During a voicemail message Galaska left CI-4 on May 26, Galaska asked CI-4 to call back Galaska and that Galaska had spoke to Joseph Hernke who told Galaska that Hernke had been at the residence of CI-4 but CI-4 would not open the door. Galaska further stated "you just got me worried and shit, it's no big deal dude if you're working somewhere else or something like that. Give me a call, let me know what the fuck's going on, allright." During the voicemail message Galaska left for CI-4 on June 1, 2006, Galaska stated "it's me, I'm out at your house right now" and " I'm out here with Joey, just wanted to see ah, how you're doing" and "give me a call as soon as you can, hopefully you get ahold of me man and we can work something out, like I said I ain't worried about that, but, give me a call man."

44.	In a series of calls from mid-June through at least mid-July, CI-4 communicated with Hernke and Galaska about whether CI-4 had been arrested, was cooperating with the police, etc.

12

CI-4 repeatedly assured him that he had not, and was only taking a break from dealing cocaine because of health problems and the arrest of someone who lived nearby. In many instances, CI-4 would leave a message for Galaska, but Hernke would return the call, or vice-versa, clearly indicating that the two were continuing to work together in selling cocaine. In mid and later July, Hernke told CI-4 that Galaska was nervous about dealing with CI-4, and that Hernke was now going to be responsible for conducting drug transactions with CI-4.

45. On August 3, 2006, CI-4 called and spoke with Galaska regarding cocaine trafficking. Galaska also told CI-4 that Hernke had moved to a new residence in Wauwatosa, which I have identified through utility and telephone records, and through surveillance, as 1675 North 116th Street, Wauwatosa.[3] CI-4 subsequently told Galaska, "But ah, yeah, I want to try to square up with you here so, I know it's been awhile." Galaska told the CI, "Well don't worry about that man ah, I'll give you a call then if I hear something or I'll get ahold of Joey (Joe Hernke) too." I have reviewed the call that Galaska was expressing to CI-4 that he was waiting on his source to obtain cocaine.

### viii. Summary of the drug information above

46. In sum, the information above establishes that beginning at least by 2001, and continuing to the present, Jeffrey Galaska and Joseph Hernke have been working together to distribute cocaine in southeastern Wisconsin, and that Jennifer Carlson has assisted Galaska in storing and selling cocaine. Galaska and Hernke use their own residences (3769 S. 22nd Street, Milwaukee; and 1675 North 116th Street, Wauwatosa), along with the residences of other coconspirators – including Carlson – and customers from which to conduct their cocaine trafficking. The above information also establishes probable cause to believe that Galaska, who has never held legitimate employment, has amassed significant assets from his drug dealing, and that he has used relatives and close associates as nominees, to conceal his ownership of the assets and to conceal his drug trafficking activities. Set forth below is additional evidence establishing the financial involvement of Susan Christie (Galaska's mother), Nicole Ruhrer (Galaska's sister), Angela Stein (Galaska's ex-girlfriend), and Randy Stein (Angela Stein's brother and a drug associate of Galaska).

## E. PROBABLE CAUSE - FINANCIAL INFORMATION/MONEY LAUNDERING

### i. Tax Return Information / Employment

---

[3]For example, on August 3, 2006, I observed a black Buick Riviera, Wisconsin license 551HPV parked in the driveway at 1675 N. 116th St., Wauwatosa. In the past several months, I and other agents have observed Hernke regularly driving this vehicle. DOT records reflect that the vehicle is registered to Hernke's girlfriend, Tammy L. Carlson, at the address I knew them to formerly live at, 1408 Missouri Ave., South Milwaukee. WE Energies lists Joseph Hernke as the subscriber of service at 1675 N. 116th St., upper unit, Wauwatosa, since July 9, 2006. As an aside, the vehicle was also previously titled to Susan Christie at 3727 W. Birchwood, Milwaukee.

13

47. I have reviewed WI Department of Revenue records and tax returns for Jeffrey J. Galaska, Susan F. Christie and Thomas J. Christie, Nicole C. Ruhrer, Jennifer J. Ruhrer, and Angela L. Stein. They reflect the following:

(a) **Jeffrey Galaska**: Galaska has reported no income, and did not file Wisconsin Income Taxes, for the years 2000 - 2005. I have found no evidence or information from any source that Galaska has worked a legitimate job in the past six years.

(b) **Thomas A. Christie and Susan F. Christie**: Thomas and Susan Christie filed joint tax returns. They reported adjusted gross income in the range of $27,000 to $35,000 during the years 2000 through 2005. In 2004 and 2005, they also reported receipt of approximately $14,000 each year in social security benefits. In particular, Susan Christie reports income of approximately $2,800 to $10,400 per year from Boston Market restaurants. For the six years 2000-2005, the Christies' income jointly totaled $215,075.

(c) **Nicole C. Ruhrer**: Nicole Ruhrer reported income for the tax years 2000 through 2005 in the range of $6,552 to $28,000 per year. For the six years 2000-2005, her income totaled $129,136.

(d) **Jennifer J. Ruhrer:** I know from informant information and public database checks that Jennifer is Galaska's sister. Jennifer Ruhrer reported no income for 2003 through 2005, and reported only $1108, $1,772 and $4,583 for the years 2000 through 2002.

(e) **Angela L. Stein**: Angela Stein is a hair stylist, and reported income of approximately $6,000 to $9,400 in the tax years 2000 to 2004. She did not report any income in 2005.

(f) **Joseph Hernke**: Joseph Hernke reported no income for the years 2001, 2002, 2003 and 2005. His adjusted gross income for 2004 was approximately $19,000.

## ii. Purchase/ownership of real property - 3769 S. 22nd Street, Milwaukee.

48. As established above, 3769 S. 22nd St., Milwaukee, is Galaska's residence where he resides with his sister, Nicole Ruhrer. WE Energies lists the subscriber of service at 3769 S. 22nd St., Milwaukee as Nicole C. Ruhrer, since May 2004. In the past several months, I have regularly observed Galaska driving a 2005 black/ dark blue Dodge Magnum, Wisconsin license 290JHY, and a white Nissan Frontier pickup, Wisconsin license 570410. Both vehicles are parked on a daily basis at Galaska's residence, 3769 S. 22nd St., Milwaukee. I have also observed Galaska at the residence numerous times over the past several months.

49. I have reviewed bank and mortgage records relating to the purchase and sale of this home. They reflect that in February 2001, Angela Stein (then Galaska's girlfriend) purchased the home for $109,600. Stein financed $82,200 of the home. On the loan underwriter worksheet, there are handwritten notations that Angela Steins' income "appear[ed]overstated considering low current

14

rent and no savings." Stein claimed on the loan application documents that she was earning $4,200 per month as a self employed hair stylist for the previous 2 ½ years, which is entirely inconsistent with the tax information set forth above.

50.     In May 2004, Nicole Ruhrer purchased the home from Stein for approximately $92,000. She financed approximately $72,000 (the payoff amount on Stein's loan), and made a downpayment of $19,515. The loan was processed by Joseph A. Rajchel, the boyfriend of Jennifer Ruhrer (Galaska's sister). The loan documents reflect that $20,000 was gifted by Jennifer Ruhrer to Nicole Ruhrer for the purchase. Included in the documents was a signed letter by Jennifer Ruhrer which stated that her loan to Nicole Ruhrer never had to be repaid. As noted above, Jennifer Ruhrer has reported no income since 2003. As explained more fully below, Nicole Ruhrer's bank accounts nowhere reflect the $20,000 gift; the accounts reflect that the source of the funds for Nicole Ruhrer's $19,515 downpayment was a $7,950 cash deposit and two cashier's checks that were not from Jennifer Ruhrer.

51.     I have also reviewed Ruhrer's payment history for the mortgage. She has made a total of $10,181.92 in monthly payments from July 2005 to March 2006; and a total of almost $20,000 from June 2004 to March 2006. (During 2004 and 2005, her tax returns reflect income of just $24,997 and $28,006 in adjusted gross income).

### iii.     Purchase/ownership of vehicles - Dodge Magnum - Susan Christie

52.     As indicated above, Galaska is known to regularly drive a 2005 black/blue Dodge Magnum. I have reviewed Daimler Chrysler Corp. records which reflect that the vehicle was purchased by Susan Christie in April 2005. DOT records reflect that Christie registered the vehicle using her mother's address, 3728 S. 15th Pl. Milwaukee. She has never been observed to drive the vehicle. Christie purchased the vehicle for approximately $38,000, putting $1,000 cash down and an approximately $20,000 trade-in allowance for a Yukon Denali (known to be formerly driven by Galaska). Christie financed the remaining $16,000, with a payment plan of $303 per month for six years.

53.     The dealership/purchase documents for the Dodge Magnum contain a photocopy of Galaska's Wisconsin driver's license, with handwritten notations on the photocopy of "change grill to black," "wants to be at $7,000 trade difference" and also some telephone numbers.

54.     I have also reviewed the payment history on the loan. A total of $14,180 was paid toward the loan between April 2005 and March 2006. Christie's bank records reflect three of those payments, totaling $4,680, financed with cashier's checks purchased with cash. Additional payments (totaling $9,500) have been made in amounts ranging from $500 to $3,500, all from unknown sources.

15

### iv. Purchase/ownership of vehicles - Nissan Frontier - Susan Christie/Angela Stein

55.     Galaska is also known to regularly drive a 2002 Nissan Frontier. I have reviewed records from the purchase of that vehicle. It was purchased by Angela Stein, Galaska's ex-girlfriend, in September 2002, and registered at Galaska's address, 3769 S. 22nd Street. Records reflect that the vehicle was purchased by Susan Christie (from Stein) in September 2004 for $18,797, the exact payoff balance on Stein's loan. It is now registered in the name Susan Christie, at Christie's home address, 3727 W. Birchwood, Milwaukee. She has never been observed to drive the vehicle; it is always driven by Galaska.

56.     Christie has financed the vehicle through Brewery Credit Union. I have reviewed loan documents and the payment history on the loan. In total, Christie made payments of $14,380 between October 2004 and March 2006 on this vehicle loan. With the exception of just one payment, the payments were made via cash or with money orders funded by same-day cash deposits.

### v. Purchase/ownership of vehicles - Jeep Wrangler - Susan Christie/Nicole Ruhrer

57.     According to informant information, Galaska is also known to have regularly driven a 2004 silver Jeep Wrangler, with license plate 835FKA. I had also observed the Jeep parked on a daily basis at Galaska's residence until approximately May 2006. DOT records reflect that the registered owners of the Jeep Wrangler are Susan F. Christie and Nicole C. Ruhrer, 3727 W. Birchwood Ave., Milwaukee. Since May 2006, I have observed the Jeep Wrangler alternately parked at Galaska's residence, 3727 W. Birchwood Ave. (Christie's residence) and 6020 S. 27th St (Jennifer Ruhrer's residence, another of Galaska's sisters).

58.     I have reviewed the loan and purchase documents and also banking records of Susan Christie, Thomas Christie and Nicole Ruhrer (accounts documented in further detail below). Christie and Ruhrer purchased the Jeep in February 2004 for over $24,000. They put $6,500 cash down on the purchase. They financed approximately $17,000. Between April 2004 and February 2006, Ruhrer made approximately $6,400 in payments on the Jeep; an additional $5,800 in payments were made by unknown sources. Consequently, with the downpayment, $18,710 was paid on the Jeep from April 2004 to February 2006.

### vi. Purchase/ownership of 2001 Harley Davidson Motorcycle

59.     According to DOT records, this Harley Davidson motorcycle is registered to Jeffrey Benkowski, W8064 Moose Lake Rd., Antigo. It is a custom built motorcycle, with a manufacturing cost of $11,690. Through the above CI information, and specifically from CI-2, Galaska was known to own a Harley Davidson motorcycle which was registered to Benkowski. Up and during the summer of 2006, law enforcement officers have observed Galaska driving this motorcycle.

16

### vii.    2002 white GMC Yukon Denali

60.    According to DOT and purchase documents, this vehicle was previously registered to Susan Christie, 3727 W. Birchwood Ave., but was traded in when the above-described 2005 Dodge Magnum was purchased by Christie. Christie purchased the Yukon in October 2001 for $43,402.58, and financed over $30,000. I reviewed the loan documents, which reflected that over $24,000 was paid on the loan between 2002 and 2005. Specifically, I have been able to trace a total of $3,021 paid by Christie via money orders on this loan, and a total of $3,005 paid by Nicole Ruhrer. The remainder of the payments are untraceable to date.

### viii.    2004 Triton 190FS Boat - Wisconsin registration WS8131GR

61.    This boat, identified by CI-2 and CI-4 as belonging to Galaska, is registered to Randy P. Stein, 3935 W. Layton Ave., Milwaukee. It was purchased in 2004 for $28,353.00. Including a cash downpayment at the time of purchase, a total of $14,464 has been paid on the boat from June 2004 to June 2006. The address on the loan documents for the boat is Randy Stein's home residence, 11135 W. Ohio Street, Milwaukee.[4] I have reviewed the loan documentation[5] for the boat loan, and as currently as June 2006, Stein continues to make payments on the loan.

### ix.    2003 Tracker Nitro 188 Sport Boat

62.    CI-2 told me that when Galaska purchased the Triton boat in 2004, for which CI-2 was present, Galaska traded in another boat which Galaska had also titled in Randy Stein's name. Through Associated Bank records, I have determined that in 2003, Randy Stein purchased a 2003 Tracker Nitro 188 sport boat for $23,501.28, using an $8,500 cash downpayment. He used the address 11135 W. Ohio St., West Allis, and financed approximately $15,000. The loan was paid off in 2004 at the time of the purchase of the Triton boat, described above. Loan documents reflect a total of $5,690 in payments made on this boat between April 2003 to April 2004. The loan application was a joint application between Randy Stein and Tina Stein.

### x.    Summary - vehicle purchases and loan payments

---

[4] I have reviewed the year tax returns filed by Randy Stein and Tina Stein from 2000 to 2005. During 2000-2003 and 2005, they listed their address as 11135 W. Ohio. They also reflected on their returns that 11133 was a rental property. For 2004 and 2005, they listed 11135 as the rental property but also used it as their home address on their returns. However, I have also conducted garbage searches at the duplex, and have checked utilities. Both the garbage and the utilities checks reflect that the Steins are now residing in 11133 W. Ohio.

[5] The loan is a joint application between Randy Stein and Tina Stein.

63.     The total known vehicle loan payments made by Susan Christie between January 2004 and March 2006 on the Dodge Magnum, Nissan Frontier, Jeep Wrangler and GMC Yukon, are $28,406.90. By date, they include:

2004 - $2,180.76
2005 - $13,866.14
2006 - $13,540.00

64.     The total known vehicle loan payments made by Nicole Ruhrer between January 2002 and March 2006 on the Jeep Wrangler and GMC Yukon, and a Kia Spectra vehicle that she maintained a loan on, were $19,898.87. By date, they include:

2002 - $1,731
2003 - $3,699.38
2004 - $11,297.27
2005 - $3,367.17
2006 - $309.43

65.     I have reviewed the vehicle loan payment history on the Dodge, Jeep, and Yukon, all vehicles that belonged to Galaska but were titled in Christie's name, and on the Kia that Ruhrer financed. A total of approximately $47,316 in payments were made toward these four vehicles for which I have been unable to trace a payment source. By date, they include:

2001 - $505.38
2002 - $6,067.42
2003 - $6061.94
2004 - $18,872.66
2005 - $14,000.00
2006 - $1,809.43

## xi.     Bank record analysis - Susan and Thomas Christie

### Susan Christie

66.     I have reviewed the statements and copies of transactions, for the time period July 2004 to June 2006, related to a savings account and a loan account (for the Nissan Frontier) maintained by Susan Christie at Brewery Credit Union.

67.     Virtually all of the vehicle payments on the Dodge Magnum, Nissan Frontier, Jeep Wrangler and GMC Yukon made by Susan Christie were made with cash, or with cash purchases of money orders used to make the payments.

18

68.     Non-cash deposits into her savings account totaled approximately $1,700: a total of $1,498.05 from Boston Market payroll checks, three unknown source of funds deposits totaling $193.31, and 1 check from Marcella Galaska in the amount of $50.

69.     From January 2005 to June 2006, Christie presented a total of $22,231 in cash to Brewery Credit Union, which she used to make payments on the Nissan Frontier loan and to purchase money orders.

70.     Christie's Brewery Credit Union records reflect she paid an additional $3,040 on the Nissan using money orders funded by an unknown source. Consequently, Christie had a total of $25,271 ($22,231 in cash loan payments and cash money order purchases, and the $3,040 in other loan payments) in expenditures documented by her bank records. Those records also reflect cash withdrawals from the savings account totaling $1,706.16.

71.     I have also reviewed records, for the time period December 2004 to December 2005, of a BankOne Mastercard maintained by Christie. According to JP Morgan Chase, who supplied the records, no statements were generated after December 2005 due to lack of activity on the account.

72.     The credit card records reflect that all monthly payments made on the credit card account between December 2004 and December 2005 were made via money order by Susan Christie. The total payments made by Christie on the account between December 2004 and December 2005 were $1,248.70.

### Thomas & Susan Christie accounts

73.     Brewery Credit Union records reflect that Thoms and Susan Christie maintain a checking, savings and mortgage accounts there. I have reviewed the statements and copies of transactions related to the accounts from January 2004 to June 2006 and all transaction receipts were signed by Thomas Christie, except those that are otherwise noted below.

74.     During this time period, approximately $85,500 was deposited into the savings and checking account. These deposits appear to be from legitimate sources, including his income, her income, his social security and a pension.

75.     I have also reviewed the withdrawal transactions, including individual checks, account transfers and cash withdrawals. A total of approximately $36,000 was withdrawn in cash from the accounts; and a total of $48,143.43 in checks were written on the checking account.

76.     I have reviewed the nature of the checks being written on the account. The checks do not reflect payments for basic necessities and living expenses, such as utilities, telephone, groceries, clothing, etc. They also do not reflect payments to credit cards (except for one Discovery card with payments totaling just $7,524) which would explain the absence of checks written for such expenses. Consequently, I believe that Thomas Christie is using the cash withdrawn from the

19

account to pay day-to-day living expenses, and that the cash withdrawn from their joint account cannot explain Susan Christie's deposits of large amounts of cash in 2004 and 2005 for use in paying for Galaska's mortgage and vehicles.

77.     The accounts also reflect that Susan Christie made a total of 17 payments all via money order or cash payment on a 2nd mortgage account totaling $5,490.

78.     The account records also reflect that in March 2006, there was a $1180 cash deposit to the savings account by Susan Christie and a same day withdrawal by Susan Christie in the form of a cashier's check payable to Chrysler Financial which was a loan payment on the Dodge Magnum.

### xii.     Total Expenditures - Susan Christie

79.     In summary, bank records and vehicle loan documents, and records of a Bank One credit card maintained from 12/04 to 12/05 by Christie, reflect individual expenditures by Susan Christie on Galaska's vehicles and her credit card as follows:

2004 - $2,305.76
2005 - $15,312.84
2006 - $13,540.00

Total 2004-2006 = $31,158.66. Additionally, Susan and Thomas Christie's bank records, for the period 1/06 to 6/06, reflect approximately $33,000 (including her $13,540 payments) in total expenditures.

80     In sum, based upon Susan Christie's nominal legitimate income, and she and her husband's basic living expenses, I believe that she is depositing cash into her individual account that she receives from Galaska, and using that money to purchase and maintain assets for Galaska.[6]

### xiii.     Bank record analysis - Nicole Ruhrer

81.     I have reviewed Ruhrer's account records with Anchor Bank, for the period January 2002 to March 2006. Ruhrer's paychecks and child support checks, which are her only two documented sources of income, are deposited each month into her checking account.

82.     The other source of deposits into Ruhrer's checking account is a large number of cash deposits. They include:

---

[6]Another example of Christie's expenditures being entirely inconsistent with her income occurred on May 31, 2005. On that date, two loan payments totaling $7,000 were made on the Magnum and the Jeep, both of which are titled to Christie. One was paid by a $3,500 cashier's check, funded by cash, and purchased by Christie. The source of the second payment is unknown, as it is reflected on the loan records but not in Christie's bank records.

2002 (June - December) Total Cash Deposits: $960
2003 Total Cash Deposits: $1,670
2004 Total Cash Deposits: $14,435
2005 Total Cash Deposits: $6,190
2006 January - March Total Cash Deposits: $1,700

83.     Ruhrer wrote checks each month to pay a car loan she previously maintained at Harris Bank for the Kia vehicle that she previously owned. She also currently writes monthly checks to make payments to Chrysler Financial for the monthly loan payments on the Jeep Wrangler (beginning in April 2004), and monthly mortgage payments for the mortgage loan on 3769 S. 22nd St. (beginning in June 2004).

84.     The significant increase in cash deposits starting in 2004 is consistent with CI information, detailed previously, that Galaska purchased and titled the residence at 3769 S. 22nd St. in Ruhrer's name as a nominee in 2004, given the mortgage and associated purchase expenses.

85.     Other than her paychecks and child support, Ruhrer has no other source of income documented on her tax returns to justify the cash income which she has deposited into her account, especially in 2004 and 2005, and continuing into 2006. The expenditures reflected in Ruhrer's checking account nearly equal, and on some occasions exceed, the deposits (payroll, child support and cash) she has made to her account.

86.     Other transactions / bank drafts reflected in Ruhrer's checking account that indicate her assistance (and Christie's) to Galaska in purchasing and maintaining his assets include a June 2002 check, totaling $990, written to Bark River Campground, the location of the lot which Galaska rents for his trailer. a June 2002 cashiers check to Discover for $2,598 with a memo of re: Susan Christie; a November 2002 deposit of $423.98 with the checks endorsed to Ruhrer from Susan Christie which included Christie's payroll check from Boston Market, with the deposited checks withdrawn in cash; a December 2003 check # 2440 to GMAC in the amount of $505.38 for the GMC Yukon loan payment; a March 2004 check # 2181 to GMAC in the amount of $2500 for the loan payment on the GMC Yukon with a memo of "Susan Christie." These transactions also indicate that Nicole Ruhrer in conjunction with Susan Christie assist Galaska in laundering his drug proceeds as both Ruhrer and Christie made loan payments on Galaska's GMC Yukon.

### xiv.    Total Expenditures - Nicole Ruhrer (vehicles and mortgage payments)

87.     In summary, the vehicle and mortgage documents for the Kia, Jeep Wrangler, Yukon and 3769 South 22nd Street, reflect expenditures by Ruhrer on these assets as follows:

2002 - $1,731
2003 - $3,699.38
2004 - $16,583.53

21

2005 - $12,115.17
2006 - $6,014.51 (vehicles Jan. - Feb. 2006; mortgage January - May 2006)

Total 2002-2006 = $40,143.59

88.     In sum, based upon Nicole Ruhrer's legitimate income, and her other documented living expenses, I believe that Ruhrer is depositing cash into her account that she receives from Galaska, and using that money to purchase and maintain the mortgage and other assets for Galaska.

## F.     OTHER INFORMATION - Telephone Records

89.     I obtained various cellular and hardline telephone records during this investigation. These records are maintained by the individual telephone service providers. Pen register and trap and trace orders were also obtained for Galaska's cellular telephone, 414-467-3673. Finally, court orders were obtained for pens and traps on Galaska's other cellular telephone number, 414-736-3534.

90.     I reviewed the total call volume captured between Galaska's two cellular telephone numbers and the below listed numbers. They are listed in the following format:

Calls between below listed #'s and:
1. Target 1 # 414-736-3534 (only in service from 4/11/06 to 4/21/06)
2. Target 2 # 414-467-3673

**Joseph Hernke Total Calls: 323**

414-610-2116 - subscribed to by Joseph Hernke
1. 51 calls (04/11/06 to 04/21/06)
2. 168 calls (05/02/06 to 08/02/06)

414-570-6402  subscribed to by Sue Barbian (used by Hernke)
** I know this telephone is used by Joseph Hernke because CI-4 has called him at that number during recorded calls and Hernke provided the number to CI-4 as his landline telephone his former address, 1408 Missouri.
1. no calls
2. 97 calls  (05/02/06 to 07/12/06)

414-475-9872  subscribed by Michelle Carlson, 1675 N. 116th St., Hernke's current address.
1. No calls
2. 16 calls  (08/02/06 to 08/11/06)

22

**Randy / Tina Stein Total Calls: 159**
414-232-5203  Randy Stein
1. 35 calls (04/11/06 to 04/21/06)
2. 124 calls (05/04/06 to 08/07/06)

**Angela Stein: Total Calls: 90**
414-429-4774  Angela Stein
1. 5 calls  (04/16/06 to 04/21/06)
2. 85 calls (05/05/06 to 08/07/06)

**Jennifer Carlson: Total Calls: 777**
414-698-3644  This cellular telephone is maintained in Carlson's name with an address of 1334 Marquette Avenue, Milwaukee, WI.
1. 110 calls (04/11/06 to 04/21/06)
2. 628 calls ( 05/04/06 to 08/07/06)

JAY NOVAK
Special Agent
Wisconsin Department of Justice -
    Division of Criminal Investigation

Signed and sworn before me
this 14 day of August, 2006.

Notary Public
My commission is permanent.

23